Benjamin C. Fields (SBN 331033)
FIELDS LAW FIRM
354 Pine Street, Third Floor
San Francisco, California 94104
Ph: (415) 376-2877 F: (816) 659-9969
Email: ben@fieldslawkc.com

Stuart L. Cochran (admitted *pro hac vice*)
Texas State Bar No. 24027936
Nick H. Burns (admitted *pro hac vice*)
Texas State Bar No. 24128189
CONDON TOBIN SLADEK SPARKS
NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Ph: (214) 265-3800
scochran@condontobin.com
nburns@condontobin.com

Attorneys for Plaintiffs, Jose Buenrostro, Randal Allen, Sr., Miller McCrabb, Eduardo Caraballo, Tony Malone and Joemar

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| JOSE BUENROSTRO, RANDAL ALLEN, SR., MILLER MCCRABB, EDUARDO CARABALLO, TONY MALONE, AND JOEMAR NEAL, individually and on behalf of all others,<br><br>*Plaintiffs,*<br><br>v.<br><br>HARBOR FREIGHT TOOLS USA INC.,<br><br>*Defendants.* | Case No.: 2:26-cv-38<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL AND CLRA DECLARATION SUPPORTING VENUE** |

Plaintiffs, JOSE BUENROSTRO, RANDAL ALLEN, SR., MILLER

MCCRABB, EDUARDO CARABALLO, TONY MALONE, AND JOEMAR NEAL ("Plaintiffs"), individually and on behalf of all other similarly situated citizens of California, New York, Texas, Illinois, Missouri, and Florida, allege the following facts and claims against Defendant HARBOR FREIGHT TOOLS USA INC. ("Harbor Freight" or "Defendant") upon personal knowledge, investigation of counsel, and information and belief.

This Amended Complaint is being filed as a matter of right within 21 days of the filing of a responsive pleading or Rule 12(b) motion, pursuant to Fed. R. Civ. P. 15(a)(1)(B) and L.R.15-2.

## I. JURISDICTION AND VENUE

1. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2) because the amount in controversy exceeds the jurisdictional amount provided therein, and some of the class members are from states other than California, and thus diverse from Defendant Harbor Freight Tools USA, Inc., which is a citizen of the State of California.

2. This Court has personal jurisdiction over Defendant because it is a citizen of California, maintains its principal place of business in California, has more than minimum contacts with California and purposefully avails itself of the privilege of conducting business in California. Defendant markets its products in California in written advertising, in retail Harbor Freight stores in California, and on the Internet. As such, Defendant is "at home" and subject to general and specific jurisdiction in California for all of the claims alleged herein.

3. Venue is proper in this forum pursuant to 28 U.S.C. § 1391 because Defendant is a resident of Calabasas, California, it maintains its principal place of business there, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred there.

4. Plaintiffs are filing herewith a CLRA Declaration Supporting Venue, pursuant to Cal. Civ. Code § 1780(d), which is attached hereto as **Exhibit A**.

## II. INTRODUCTION

5. Defendant Harbor Freight's 3/8-Inch Drive, 18-Inch-Long Ratcheting Breaker-Bar has been failing and causing personal injuries and economic damages for years. There are currently other pending cases pursuing the personal injury claims. This case seeks to force Harbor Freight to pay damages to all those to whom it has sold the defective tools, which pose a safety risk to consumers.

6. Many breaker bars have a static or fixed headed anvil or tang – the squarish end-piece that snaps into the backside of the socket that "drives" the bolt or nut when being used.

7. Harbor Freight offered a product that differed from many other breaker bars on the market, in that the "head" of its breaker bar also ratchets, much in the same way a shorter ratcheting socket wrench will allow a user to move the wrench both directions while loosening or tightening a fastener which saves time and effort on the user. Harbor Freight refers to this product as a "ratcheting breaker bar."

8. On information and belief, the reason many breaker bars do not have a ratcheting head, is due to the greater strength and structural integrity needed to perform the job of a breaker bar. In short, imparting much more torque or force on the fastener being tightened or loosened is more manageable from a design and structural engineering standpoint if the head is a fixed part rather than integrating the components required for a ratcheting feature.

9. Defendant knowingly and willfully misrepresented to consumers that its 3/8-Inch Drive, 18-Inch-Long Ratcheting Breaker-Bar (sometime hereinafter the "PRODUCT" or "PRODUCTS") is a breaker bar fit for the purpose of reliably applying the amounts of torque required to tighten and loosen fasteners as other

breaker bars do. Defendant further misrepresented the character and quality of the PRODUCT by asserting that the PRODUCT was "[m]ade for extreme durability" and constructed out of "[h]eavy duty chrome plated chrome vanadium steel" which made it fit for "heavy duty" use. Defendant further represented that the PRODUCT was robust and strong enough to be safely used as a breaker bar. These representations are collectively referred to herein as the "Representations." Contrary to the Representations, the PRODUCT is not fit to perform its intended purpose as a tool applying the torque of a breaker bar.

10. Breaker bars are a special type of socket driving tool that are used when large amounts of force and torque are needed to tighten or loosen a fastener, with the lug nut on a car or truck's wheels being the single most common use for such a tool. Breaker bars are equipped with a handle that is significantly longer than other wrenches to provide the user with the necessary leverage to break loose bolts that require a large amount of torque to tighten or, more frequently, remove the fastener. The makers and sellers of breaker bars, including Harbor Freight, know that this type of tool must be very robust and strong to endure expected and intended uses.

11. A picture from Defendant Harbor Freight's website of the breaker bar at issue in this lawsuit is shown below, red arrows added for demonstrative use.

PITTSBURGH PRO

3/8 in. Drive 18 in. Ratcheting Breaker Bar

(531) Write a Review

This breaker bar features a ratchet head that swivels 180 degrees

$19.99



## PRODUCT OVERVIEW

This breaker bar has reversible ratcheting action plus the option to lock the ratchet mechanism for use as a traditional breaker bar. The 3/8 in. drive ratchet head swivels 180 degrees. Made of for extreme durability.

- Left/right reversible ratcheting action
- Head locks in place for use as a standard breaker bar
- Heavy duty chrome plated chrome vanadium steel

12. Defendant Harbor Freight's PRODUCT is differentiated from other breaker bar products insofar as it has incorporated a cylindrical ratcheting mechanism at the end of the breaker bar—see added red arrows above. Many, if not most, breaker bars do not have a ratcheting function. On information and belief, the reason that most breaker bars do not ratchet and are fixed is due to the strength that is required for a breaker bar application. The ratcheting mechanisms create a weak point that is vulnerable to failure when typical breaker bar forces are applied.

Instead, it is most common for a breaker bar to be used to "break loose" a very tight fastener first, then users will switch to a ratchet to finish removing the fastener.

13. But Defendant tried to incorporated the ratcheting mechanism into the breaker bar, itself. On information and belief, Defendant was hoping to differentiate its PRODUCT in the marketplace by adding a ratcheting mechanism but did so without appropriately considering how the ratcheting feature would affect the PRODUCT's fitness, utility, and safety as a breaker bar.

14. Due to Defendant's Representations regarding the utility of the PRODUCT and its failure to disclose material safety defects, consumers regularly pay approximately $20.00 for the PRODUCT.

15. However, Defendant's PRODUCT frequently fractures and fails when ordinary torque is applied during the use of the PRODUCT in ordinary, foreseeable circumstances.

16. Defendant repeatedly received notice over more than a decade that its PRODUCT was failing in the hands of its consumers. Harbor Freight received notice from many of its customers posting reviews on Harbor Freight's website to report that their breaker bars broke during foreseeable and expected uses. In fact, some consumers even posted photographs of the failure to their breaker bars directly onto Harbor Freight's website – their pictures all reveal a fracture failure mode that looks virtually identical to one another. Only a few examples of the many postings from Harbor Freight's website are shown below.

## TERRIBLE!!!

Broke the first time I used it. The ratcheting system snapped in two. Cheap metal housing.

Eric
May 24, 2018





Works good short term but will break

Shannon, Feb 8, 2022



3/8 in. Drive 18 in. Ratcheting Breaker Bar

WRITE REVIEW



Do not buy

Chris, Sep 14, 2022



3/8 in. Drive 18 in. Ratcheting Breaker Bar

WRITE REVIEW







17. The the customer reviews posted to Harbor Freight's website and published on the publicly accessible website reflect thatHarbor Freight's own website tells part of the story. , b Between September of 2011 and January of 2024, customers posted moret than Harbor Freight had received over 100 individual customer reviews to its website that described a total of at nearlydescribing approximately 130 separate individual breaker bar failures. The number well exceeds 100 reviews because – as some customers reported that they had suffered

a second, third, or fourth failure after Harbor Freight replaced their broken product under warranty of the same product after prior failed products had been returned and then replaced under Harbor Freight's warranty program. These are only the customer reviews that Harbor Freight chose to leave on its public website.

18. The uniformity of these complaints is striking. Nearly every negative review described the same type of failure, a pattern confirmed by the photos they attached to the reviews. Those documents are subject to a protective order entered in the *Geraci* case.

19. Harbor Freight did not publish all of the negative reviews it received. As established in the *Geraci* litigation and alleged in *Copus v. Harbor Freight Tools USA, Inc.*, Western District of Texas, No. 1:26-cv-00270-DAE, Harbor Freight affirmatively removed and suppressed a portion of the negative customer reviews submitted to its website.

20. Customer complaints were not limited to online reviews. from its cConsumers also who reported breakages, and and even even injuries, and near-miss incidents directly to the company. Harbor Freight documented these incidents in "Customer Incident Reports" and "Product Claim Analysis Reports." Harbor Freight repeatedly received notice about the defective design of its ratcheting breaker bar years prior to its eventual testing of, and alteration to, the design of its 3/8-inch drive ratcheting breaker bar.

21. The discovery of the hidden customer reviews and reports from individual consumers about failures with injuries or near miss incidents in the *Geraci* lawsuit led to an evidentiary "Stipulation Regarding the Authenticity and Admissibility of Certain Documents and Information," that was entered into by the parties and filed. See *Geraci*, ECF# 102, attached in-full hereto as **Exhibit B**.

22. Under that stipulation, Harbor Freight agreed that a spreadsheet produced, bates labeled HARBOR002731, contained all customer reviews – both

those published on its website and those it withheld from public views. Harbor Freight stipulated that the document was authentic, qualified as a business record, and that the reviews it contained "are relevant and shall be admitted into evidence at trial in this matter for purposes of showing notice to Harbor Freight concerning customers' stated experience with the product, including the alleged dangers and defects that Plaintiff has asserted in this lawsuit."

23. The same stipulation also addressed Customer Incident Reports and Product Claim Analysis Reports produced in the *Geraci* matter at documents bates labeled, HARBOR002769 – 2777 and HARBOR003572 – 3589. These documents were agreed and stipulated as authentic business records for evidentiary purposes, but also that they, "are relevant and shall be admitted into evidence at trial in this matter for purposes of showing notice to Harbor Freight concerning the alleged dangers and defects Plaintiff has asserted in this lawsuit."

24. Harbor Freight also received knowledge about the defects through the broken tools customers returned. Harbor Freight runs a facility in Camarillo, California where it receives returned merchandise, referred to as the "asset recovery" department. There, Harbor Freight had every opportunity to examine returned breaker bars, assess the cause of their failures, and determine that those failures were widespread and traceable to a single design defect: a ratcheting head made from metal too thin and too weak for the tool's intended, advertised, and foreseeable uses.

25. After more than a decade of accumulated notice and knowledge, Harbor Freight eventually released a redesigned 3/8-inch drive ratcheting breaker bar, hitting store shelves at some point in late 2024 or during 2025. The modification to the product included a modified ratcheting head made from thicker metal that was substantially stronger than the original product. The redesigned product was given a new "SKU" number and is the model now available today in

Harbor Freight stores.

26. Numerous documents produced in *Gerac*i describe this project in detail, but those materials were designated confidential under the protective orders entered in that case (see *Geraci*, ECF Nos. 19 and 97) and cannot be publicly disclosed in this pleading.

27. For years, Harbor Freight had the opportunity to conduct testing of its ratcheting breaker bar design, both on customer-returned bars and its own exemplars, from which Harbor Freight could or would have learned that its ratcheting breaker bar design was of a woefully inadequate strength to perform the tasks for which it was designed and for which Harbor Freight's customers had used the ratcheting breaker bars in a foreseeable manner. Yet, despite the extensive notice and knowledge HFT received from its own consumers about the defective design of the ratcheting breaker bar, HFT waited more than a dozen years to conduct any such testing. Documents and testimony in the Geraci matter described at the testing at length, those documents along with testimony about it by Sean O'Hern were designated confidential under the protective order, *Geraci*, ECF# 19, later amended at ECF# 96.

28. In addition to the other sources of notice outlined above, Harbor Freight received additional notice of the defects in its ratcheting breaker bars from other lawsuits.

29. As mentioned above, on February 17, 2023, a lawsuit was filed against Harbor Freight in the United States District Court for the District of Kansas, in which h a gentleman named Ronald Nicholas "Nick" Geraci pled that one of Harbor Freight's 3/8 inch drive ratcheting breaker bars had shattered during his use of the product, and in which his left eye was severely injured – a catastrophic open globe rupture – leaving him permanently legally blind in that eye and suffering from a multitude of other problems and having undergone multiple surgeries to manage

the injury and its sequalae. See *Geraci v. Harbor Freight Tools USA, Inc.*, case no.: 23-cv-2066. In his Complaint, Mr. Geraci included photographs of his breaker bar after the failure that he alleged had blinded him, and those photos are shown below.



30. The *Geraci* case was resolved by settlement and the case concluded with a joint stipulation of dismissal filed on July 9, 2024. See *Geraci* ECF # 110.

31. Harbor Freight received even more detailed forensic and scientific evidence of the defective design of its ratcheting breaker bars during the pendency of the *Geraci* matter, through both forensic examination of the broken product that was alleged to have caused Mr. Geraci's injuries, as well as additional litigation testing conducted both by its own retained experts, as well as the experts retained by Plaintiff Mr. Geraci. Testing and inspection documents were produced by both parties' experts in the *Geraci* matter.

32. On June 30, 2025, another lawsuit was filed in Los Angeles County Superior Court, in which Jeremy Copus pled that one of Harbor Freight's 3/8 inch drive ratcheting breaker bars had shattered during his use of the product, severely injuring his left eye, and leaving him suffering from a multitude of vision problems

and sequelae. *See Copus v. Harbor Freight Tools USA, Inc.*, No. 25VECV03601 – later re-filed on February 4, 2026 in the Western District of Texas, at 1:26-cv-00270-DAE, ECF# 1. Mr. Copus also included photographs of his breaker bar's failure in his Complaint – those photos are below.



33. In addition to the customer reviews submitted to Harbor Freight, the returns of failed breaker bars at its stores, and the *Geraci* and *Copus* lawsuits, on information and belief, Harbor Freight also received reports from some customers of incidents in which their breaker bars failed in similar fashion and caused minor injuries and near misses of more serious injuries.

34. The sort of failures identified in the many customer reviews sent to Harbor Freight, in the incident reports made to Harbor Freight by customers, and identified in both the *Geraci* and *Copus* matters, render the PRODUCT unusable for its intended purposes and make the PRODUCT useless. Moreover, when the PRODUCT snaps or otherwise fails, there is a substantial risk that a person using the PRODUCT at that time would suffer physical injuries. In fact, many such injuries have in fact occurred. Because the PRODUCT frequently breaks and the risks and costs of dealing with personal injuries outweigh the cost and value of the PRODUCT, the PRODUCT is worth less than consumers pay for it. Indeed, the PRODUCT is worthless.

35. Defendant fails to include any disclaimer on the PRODUCT labeling or in their advertising materials that the PRODUCT has a significant risk of failure during ordinary, expected use or that the PRODUCT has in fact failed and injured people.

36. This case seeks to recover the price of all PRODUCTS sold to consumers in California, New York, Florida, Texas, Illinois, and Missouri during the Class Period, in addition to statutory penalties and damages, punitive damages, and attorneys' fees and costs.

## III. THE PARTIES

### A. <u>Plaintiffs</u>

37. During all relevant times, Plaintiff Randal Allen, Sr. was and currently is a citizen of the State of New York residing in North Tonawanda, New York. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in Amherst, New York, to the best of his belief and recollection, in January of 2021. On what was probably the third time he used the PRODUCT he was attempting to remove "lug nuts" that were fastening

his tire and wheel to his car. However, when he was applying ordinary force for that purpose, the PRODUCT snapped. If he had known the PRODUCT faced such a significant risk of failure from its ordinary, expected use, he would not have purchased the PRODUCT or would have paid less for it. He has suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

38. During all relevant times, Plaintiff Miller McCrabb was and currently is a citizen of the State of Missouri residing in Grandview, Missouri. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in or near Grandview, Missouri, to the best of his belief and recollection, in May of 2020. If he had known the PRODUCT had a propensity to break and fail from its ordinary, expected use and put him at risk of injury, he would not have purchased the PRODUCT or would have paid less for it. He has suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

39. During all relevant times, Plaintiff Eduardo Caraballo was and currently is a citizen of the State of Illinois residing in Chicago, Illinois. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in or near Chicago, Illinois to the best of his belief and recollection, in June of 2024. If he had known the PRODUCT had a propensity to break and fail from its ordinary, expected use and put him at risk of injury, he would not have purchased the PRODUCT or would have paid less for it. He has suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

40. During all relevant times, Plaintiff Tony Malone was and currently is a citizen of the State of Florida residing in Milton, Florida. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in or near Milton, Florida, to the best of his belief and recollection, in January of 2022. If he had known the PRODUCT had a propensity to break and fail from its ordinary, expected use and put him at risk of injury, he would not have purchased the PRODUCT or would have paid less for it. He has suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

41. During all relevant times, Plaintiff Joemar Neal was and currently is a citizen of the State of Texas residing in Rosharon, Texas. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in or near Rosharon, Texas, to the best of his belief and recollection, in October of 2023. If he had known the PRODUCT had a propensity to break and fail from its ordinary, expected use and put him at risk of injury, he would not have purchased the PRODUCT or would have paid less for it. He has suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

42. During all relevant times, Plaintiff Jose Buenrostro was and currently is a citizen of the State of California residing in Los Angeles, California. During the Class Period (as defined below), he purchased the PRODUCT off the shelf at a Harbor Freight store located in Los Angeles, to the best of his belief and recollection, in October of 2024. If he had known the PRODUCT had a propensity to break and fail from its ordinary, expected use and put him at risk of injury, he would not have purchased the PRODUCT or would have paid less for it. He has

suffered injury-in-fact (economic injury) caused by Defendant's conduct that is concrete, particularized, and actual, and can be redressed by the requested judicial relief. His claims are typical of all Class Members.

43. All individual Plaintiffs purchased the PRODUCT with the understanding that it was marketed and sold as a "breaker bar" and with the expectation that it was fit for its intended use as a "breaker bar."

44. Harbor Freight maintains a transaction database that records the date, time, and store location of every customer purchase and return. Harbor Freight describes this database on own website as follows: "We maintain a database of consumer activity and other information collected in connection with a purchase or a return, which we use to authorize returns and may share with third parties that provide fraud prevention services." See https://www.harborfreight.com/customer-support/returns/in-store

45. Harbor Freight's own database can confirm the purchase dates alleged above for each plaintiff. Where a Plaintiff was unable to retrieve an exact purchase date, the date alleged reflects Plaintiff's best estimate and recollection at the time this pleading was filed.

**B. <u>Defendant</u>**

46. During all relevant times, Defendant Harbor Freight is and was a citizen of the State of California. It is a privately held corporation organized under the law of the State of Delaware with its headquarters and principal place of business in the State of California.

47. Defendant can be served with process through its registered agent, Corporate Creations Network, Inc., at 7801 Folsom Boulevard, #202, Sacramento, California 95826.

## IV. STANDING

48. Plaintiffs and putative Class Members have in the past and continue to suffer injury in fact caused by the unlawful conduct complained of in this complaint. It is likely that Defendant's unlawful conduct will be redressed by a favorable decision in the form of damages based on economic harm.

49. Defendant's materially false, deceptive, and misleading representations about the PRODUCTS caused Plaintiffs and other consumers to pay more for them than they otherwise would have paid. They were induced to pay (and overpay) for something they did not get.

50. The detailed allegations in this complaint will permit the factfinder to determine the economic injury suffered by Plaintiffs and the Class.

## V. FURTHER FACTUAL ALLEGATIONS

Harbor Freight sold the Products with a small "hang tag" attached to the end of the breaker bar that was used to hang the product from store shelves, as well as communicate information about the product. That hang tag, for this Product, making up the retail packaging also bore Representations affixed to every unit Harbor Freight sold. At all times during the class period, from approximately 2009 until the redesigned product was released in late 2024 or during 2025, each unit of the Product was sold in packaging that prominently stated on its face that the Product was an "18' RATCHETING BREAKER BAR" with a 3/8-inch drive that had a "Lifetime Warranty" and "Chrome vanadium construction." The packaging also contained the abbreviation "ANSI," implying the product complied with standards published by the "American National Standards Institute," commonly known by its abbreviation "ANSI," despite the fact that the product actually violated some ANSI standards, such as ANSI/ASME B107.10 (2005) and B107.110 (2012).

51. The same Representations appeared on Harbor Freight's website product listing for the product at: https://www.harborfreight.com/hand-tools/sockets-ratchets/3-8-eighth-inch-drive-ratcheting-breaker-bar-66388.html [1]as well as on in-store signage and point-of-sale materials displayed at Harbor Freight retail locations.

52. These Representations communicated specific, verifiable facts about the product's strength, durability, and fitness for heavy-duty use. A tool marketed as suitable for heavy-duty applications and capable of withstanding maximum torque is, by definition, a tool that a reasonable consumer would expect to apply substantial force to a fastener without the tool fracturing. That is precisely what a breaker bar is designed for, and Harbor Freight's Representations said as much.

53. The Representations were false and misleading. The Product does not perform as described under ordinary, foreseeable use. As detailed above, the ratcheting mechanism incorporated into the product's head creates a structural weak point that causes the tool to fracture during normal use. This failure mode is incompatible with the label's promise of heavy-duty durability and suitability for maximum torque applications. A product that shatters during the very use it was marketed for does not meet the representations on its label.

54. These misrepresentations bear directly on safety. A breaker bar is a hand tool designed to apply substantial rotational force to loosen or tighten fasteners. Consumers use these tools by placing their body weight and significant physical force on the tool's handle. When the product fractures under that force, the result is not a minor inconvenience. The sudden, unexpected failure of a tool under

---

[1] Using Wayback Machine archive to view former version of Harbor Freight's website as it appeared in December of 2024, when the subject Products were still being sold. See link:

https://web.archive.org/web/20141201095226/https://www.harborfreight.com/hand-tools/sockets-ratchets/3-8-eighth-inch-drive-ratcheting-breaker-bar-66388.html

load can cause the user to lose balance and control, and the fracturing metal itself poses a separate injury hazard. Harbor Freight's Representations that the Product was heavy-duty and suitable for maximum torque applications were therefore material to the reasonable consumer's safety. A consumer who knew the product was prone to fracturing during ordinary use would not have purchased it, and certainly would not have applied the force its label invited.

55. Class members were similarly exposed to the same or substantially similar misrepresentations at the point of sale, whether they purchased the Product in a Harbor Freight retail store or online.

56. Each Plaintiff saw and relied on Harbor Freight's Representations before purchasing the product. They did not know they were purchasing a tool with a hidden structural defect that rendered it unsuitable for its advertised purpose and dangerous in ordinary use. On information and belief, Harbor Freight intended for consumers to rely on these uniform Representations, which are made through all sales channels.

57. Harbor Freight had superior knowledge of the design and safety defects, while its purchasers had none. Had Harbor Freight disclosed that the Products' ratcheting mechanism created a structural weak point that caused the tool to fracture during ordinary use, Plaintiffs and class members would not have purchased the Product or paid as much for it. Plaintiffs and the class received a product of substantially lesser value than represented, one that posed a risk of injury from the very use Harbor Freight promoted. They surrendered more and received less than they would have had Harbor Freight told or disclosed the truth.

58. misrepresents and warrants that the PRODUCT is a "breaker bar." Defendant further warrants and misrepresents the character and quality of the PRODUCT by asserting that the PRODUCT is especially durable because it is

produced using chrome vanadium construction to make it fit for "heavy duty" use.Plaintiffs and the putative Class Members have suffered economic injury by purchasing a PRODUCT that is worthless or worth less than the purchase price. Every PRODUCT either has failed or will fail.

## VI. EQUITABLE REMEDIES

59. Plaintiffs and the Class lack an adequate remedy at law for all injuries alleged herein. Legal damages asserted herein are not coextensive with, and do not fully redress, the injuries that equitable restitution, disgorgement, and injunctive relief address.

60. Equitable restitution and disgorgement are necessary because Harbor Freight's aggregate revenues and profits from over a decade of sales of the defective product may exceed the total purchase prices recoverable as actual damages at law, and Harbor Freight should not be permitted to retain the difference.

61. Plaintiffs plead seek equitable (or partial equitable) relief under their Third, Fifth, Eleventh, Thirteenth, Fourteenth, and Fifteenth causes of action in the alternative under Federal Rule of Civil Procedure 8(d)(2), to the extent the Court determines that legal remedies are unavailable, incomplete, or otherwise inadequate to redress the full scope of Harbor Freight's misconduct.

## VII. CLASS ALLEGATIONS

62. Pursuant to Fed. R. Civ. P. 23(a) and (b)(2) and (b)(3), Plaintiffs bring this action on her own behalf and on behalf of a proposed classes of all other similarly situated persons ("Class Members") consisting of:

> **The New York Class:** All citizens of New York who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates in the five years preceding the date of the filing

of the Original Complaint in this case (the "Class Period").

**<u>The California Class:</u>** All citizens of California who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates during the Class Period.

**<u>The Illinois Class:</u>** All citizens of Illinois who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates during the Class Period.

**<u>The Missouri Class:</u>** All citizens of Missouri who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates during the Class Period.

**<u>The Texas Class:</u>** All citizens of Texas who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates during the Class Period.

**<u>The Florida Class:</u>** All citizens of Florida who purchased a Product at a retail store or online through a website owned or operated by Harbor Freight or its affiliates during the Class Period.

63. Excluded from the Class are: (a) federal, state, and/or local governments, including, but not limited to, their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; (b) any entity in which Defendant has a controlling interest, to include, but not limited to, their legal representative, heirs, and successors; (c) all persons who are presently in

bankruptcy proceedings or who obtained a bankruptcy discharge in the last three years; and (d) any judicial officer in the lawsuit and/or persons within the third degree of consanguinity to such judge.

64. Upon information and belief, the Classes consists of thousands of purchasers. Accordingly, it would be impracticable to join all Class Members before the Court.

65. There are numerous and substantial questions of law or fact common to members of the Classes and which predominate over any individual issues. Included within the common question of law or fact are:

a. whether Defendant's Representations in their marketing and on the PRODUCT labels about the character and quality of the PRODUCT are unfair, false, misleading, and deceptive;

b. whether Defendant's Representation that the PRODUCT is a breaker bar is unfair, false, and misleading;

c. whether Defendant's Representations in their marketing that the manufacture and production of the PRODUCT make it fit for "heavy duty" use are unfair, false, misleading, and deceptive;

d. whether Defendant intended that Plaintiffs and the Class Members would rely on its marketing Representations about the character and quality of the PRODUCT;

e. whether Defendant's Representations were warranties that Defendant breached;

f. whether Defendant breach the implied warranty of merchantability because its products would not pass without objection in the trade, were not of fair average quality, were not

fit for the ordinary purpose used, were not adequately contained, packaged, and labeled, and did not conform to the Representations.

g. whether Defendant made negligent misrepresentations;

h. whether Defendant has been unjustly enriched and if so, what appropriate equitable relief would be;

i. whether Plaintiffs and the Class are entitled to compensatory damages and statutory relief; and

j. whether Plaintiffs and the Class are entitled to attorneys' fees and costs.

66. Plaintiffs' claims are typical of the claims of Class Members in that they share the above-referenced facts and legal claims or questions with Class Members, there is a sufficient relationship between the damage to Plaintiffs and Defendant's conduct affecting Class Members, and Plaintiffs have no interests adverse to the interests of other Class Members.

67. Plaintiffs will fairly and adequately protect the interests of Class Members and have retained counsel experienced and competent in the prosecution of complex class actions, including complex questions that arise in consumer protection litigation.

68. A class action is superior to other methods for the fair and efficient adjudication of this controversy, since individual joinder of all Class Members is impracticable and no other group method of adjudication of all claims asserted herein is more efficient and manageable for at least the following reasons:

a. the claims presented in this case predominate over any questions of law or fact, if any exist at all, affecting any individual

member of the Class;

b. absent a Class, the Class Members will continue to suffer damage and Defendant's unlawful conduct will continue without remedy while Defendant profits from and enjoys its ill-gotten gains;

c. given the size of individual Class Members' claims, few, if any, Class Members could afford to or would seek legal redress individually for the wrongs Defendant committed against them, and absent Class Members have no substantial interest in individually controlling the prosecution of individual actions;

d. when the liability of Defendant has been adjudicated, claims of all Class Members can be administered efficiently and/or determined uniformly by the Court; and

e. this action presents no difficulty that would impede its management by the court as a class action which is the best available means by which Plaintiffs and members of the Class can seek redress for the harm caused to them by Defendant.

69. Because Plaintiffs seek relief for the entire Class, the prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual member of the Class which would establish incompatible standards of conduct for Defendant.

70. Further, bringing individual claims would overburden the Courts and be an inefficient method of resolving the dispute which is the center of this litigation. Adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interest of other members of the Class who are not parties to the adjudication and may impair or impede their ability to protect

their interests. Thus, class treatment is a superior method for adjudication of the issues in this case.

## VIII. CAUSES OF ACTION

### FIRST CAUSE OF ACTION: Breach of Express Warranty

*(On Behalf of Plaintiffs and the New York, California, Illinois, Florida, Missouri and Texas Classes Under the Law of Each Applicable State)*

71. Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

72. In advertising, marketing, selling, and distributing the PRODUCTS with the Representations, Defendant made promises and affirmations of fact, that the PRODUCT was in conformity with the Representations.

73. Defendant, through its advertising and labeling, created express warranties that the PRODUCTS comport with the express Representations. As express warranties, the Representations became part of the basis of the bargain between Defendant and Plaintiffs as well as between Defendant and each of the putative Class Members.

74. These express warranties were made by Defendant in writing and specifically relate to the goods being sold.

75. In breach of Defendant's express warranty, the PRODUCT does not comport with the Representations. The PRODUCT is mislabeled and is not what Defendant represents it to be.

76. Plaintiffs and the putative Class Members purchased the PRODUCTS. As a result of Defendant's breach of express warranty, Plaintiffs suffered damages, including the full purchase price of the PRODUCT or the difference between the

PRODUCT as represented and the value of the PRODUCT as delivered.

77. As a direct and proximate result of Defendant's breach of express warranty, Plaintiffs and the putative Class Members were harmed in the amount of the purchase price they paid for the PRODUCTS. The economic losses and other general and specific damage suffered by Plaintiffs and the putative Class Members include, but are not limited to, the amounts paid for the PRODUCTS and any interest that would have accrued on those monies in amounts to be proven at trial.

78. Plaintiffs, within a reasonable time after discovering the breach, provided Defendant with timely notice of its breach of warranty claim.

79. Because all Plaintiff and Class Member purchased the Product from Harbor Freight, all are in privity with the Defendant.

## **SECOND CAUSE OF ACTION: Breach of Implied Warranty – Merchantability**

*(On Behalf of Plaintiffs and the New York, California, Illinois, Florida, Missouri and Texas Classes Under the Law of Each Applicable State)*

80. Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

81. Defendant marketed, distributed, and sold the PRODUCT for the ordinary and intended use of applying substantial torque to break-free or loosen other items by applying the torque of a PRODUCT.

82. Defendant impliedly warranted that the PRODUCTS it marketed, distributed, and sold were merchantable, would pass without objection in the trade under the contract description, were of fair average quality, were fit for the ordinary

purpose for which they are used, were adequately contained, packaged, and labeled, and conformed to the promises and affirmations that the PRODUCTS were in fact what they purport to be in the Representations and Product labeling.

83. Defendant breached the implied warranties because the PRODUCT was not merchantable, would not pass without objection in the trade, was not of fair average quality, was not fit for the ordinary purpose for which it is used, was not adequately contained, packaged, and labeled, and did not conform to the Representations.

84. As a result of Defendant's breach of implied warranty, Plaintiffs suffered damages, including the full purchase price of the PRODUCT or the difference between the PRODUCT as represented and the value of the PRODUCT as delivered.

85. Plaintiffs, within a reasonable time after discovering the breach, provided Defendant with timely notice of its breach of warranty claim.

86. Because all Plaintiff and Class Member purchased the Product from Harbor Freight, all are in privity with the Defendant.

## **THIRD CAUSE OF ACTION: Negligent Misrepresentations**

*(On Behalf of Plaintiffs and the New York, California, Illinois, Florida, Missouri and Texas Classes Under the Law of Each Applicable State)*

87. Plaintiffs repeat and reallege the allegations of the preceding paragraphs.

88. Defendant supplied false information to Plaintiffs for their guidance and benefit in ascertaining the nature, quality, and properties of the PRODUCT.

89. Defendant further supplied false information to Plaintiffs for their guidance and benefit by informing them that the PRODUCT conformed to the Representations.

90. Defendant had a duty to disclose material facts to Plaintiffs about the nature, quality, and conditions of the PRODUCT by virtue of its superior and unique knowledge of the facts and its own culpability in creating Plaintiffs' mistaken belief that the PRODUCT was fit to perform its intended function as a breaker bar and that it was produced to make it fit for "heavy duty" use.

91. Defendant breached the foregoing duties, including, without limitation, by:

a. misrepresenting to Plaintiffs that the PRODUCT was fit to perform its intended function as a breaker bar and that it was produced to make it fit for "heavy duty" use;

b. misrepresenting to Plaintiffs that the PRODUCTS were otherwise suitable for their intended use;

c. supplying Plaintiffs misleading information about the quality and nature of the PRODUCT; and/or

d. omitting material information about nature, quality, and conditions of the PRODUCT.

92. As a result of Defendant's negligent omissions, Plaintiffs suffered damages, including the full purchase price of the PRODUCT or the difference between the PRODUCT as represented and the value of the PRODUCT as delivered.

**FOURTH CAUSE OF ACTION: Unjust Enrichment**

*(On Behalf of Plaintiffs and the New York, California, Illinois, Florida,*

*Missouri and Texas Classes Under the Law of Each Applicable State)*

93. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint and plead this cause of action in the alternative under Fed. R. Civ. Pro. 8.

94. One who unjustly retains a benefit, and is therefore unjustly enriched, at the expense of another is required to make restitution.

95. Defendant received a benefit from the sale of the PRODUCT to Plaintiffs and Class Members.

96. It would be unjust to allow Defendant to retain this benefit because the benefit resulted from Defendant's deceptive omissions in marketing and selling a defective product.

97. The retention of the benefit was at the expense of Plaintiffs and Class Members.

98. Thus, Plaintiffs seek restitution for the sums of all money paid to Defendant for the purchase of the PRODUCT during the Class Period.

**FIFTH CAUSE OF ACTION: Violation of New York General Business Law § 349**

*(On Behalf of Plaintiff Allen and the New York Class)*

99. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

100. Section 349(a) of the New York General Business Law ("GBL") prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce."

101. Defendant misleadingly, inaccurately, and deceptively misrepresents the PRODUCT to consumers with the Representations, including that the PRODUCT is fit for its intended use as a tool for applying the torque of a breaker bar. Defendant further misrepresents the strength of the PRODUCT by asserting that the PRODUCT is produced using chrome vanadium construction to make it fit for "heavy duty" use.

102. Defendant's improper consumer-oriented conduct is misleading in a material way because the PRODUCTS do not have sufficient strength or resilience to be safely and reliably used as a breaker bar.

103. The conduct of Defendant alleged herein constitutes recurring, "unlawful" deceptive acts and practices in violation of GBL § 349.

104. Plaintiffs and other Class Members have been injured because they received less than what they bargained or paid for.

105. As a result of Defendant's recurring deceptive acts and practices, Plaintiffs and the other Class Members seek to recover statutory damages of $50 per violation or compensatory damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct.

106. Further, Plaintiffs and the other Class Members seek to recover their reasonable attorney's fees, as allowed by GBL § 349(h).

107. Further, because Defendant made its untrue or misleading representations willfully or knowingly within the meaning of GBL § 349(h), Plaintiffs and the other Class Members seek to have the awards of damages increased to an amount equal to three times the amount of actual damages.

**SIXTH CAUSE OF ACTION: Violation of New York General Business Law § 350**

*(On Behalf of Plaintiff Allen and the New York Class)*

108. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

109. GBL § 350 provides, in part, as follows: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

110. GBL § 350a(1) provides, in part, as follows: The term "false advertising, including labeling, of a commodity, or of the kind, character, terms or conditions of any employment opportunity if such advertising is misleading in a material respect. In determining whether any advertising is misleading, there shall be taken into account (among other things) not only Representations made by statement, word, design, device, sound or any combination thereof, but also the extent to which the advertising fails to reveal facts material in the light of such Representations with respect to the commodity or employment to which the advertising relates under the conditions proscribed in said advertisement, or under such conditions as are customary or usual …."

111. Defendant made the material misrepresentations described in this Complaint in Defendant's PRODUCTS' marketing, advertising, packaging, and labeling. Specifically, Defendant's labeling and advertisements contain untrue and materially misleading statements concerning Defendant's PRODUCTS, including the Representations regarding its fitness for its intended purpose as a breaker bar and its allegedly "heavy duty" construction.

112. Defendant's marketing, advertising, packaging, and product labeling

induced the Plaintiffs and Class Members to buy Defendant's PRODUCTS.

113. Plaintiffs and other Class Members have been injured because they relied on Defendant's Representations and paid a premium for the PRODUCTS which were false and deceptive. In other words, Plaintiffs and other Class Members received less than what they bargained or paid for.

114. Defendant's untrue and misleading Representations were made willfully, wantonly, and with reckless disregard for the truth.

115. Defendant's material misrepresentations are substantially uniform in content, presentation, and impact upon consumers at large. Moreover, all consumers purchasing the PRODUCTS were and continue to be exposed to Defendant's material misrepresentations.

116. Based on Defendant's recurring, acts, and practices in violation of GBL § 350, Plaintiffs and Class Members are entitled to monetary and compensatory damages, restitution, and disgorgement of all moneys obtained by means of Defendant's unlawful conduct, interest, and attorneys' fees and costs as well as statutory damages.

## **SEVENTH CAUSE OF ACTION: Violation of Missouri's Merchandising Practices Act**

*(On Behalf of Plaintiff McCrabb the Missouri Class)*

117. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

118. The Missouri Merchandising Practices Act (the "MMPA") prohibits

the act, use, or employment by any person of any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact about the sale or advertisement of any merchandise in trade or commerce. See RSMo. § 407.020.

119. Defendant advertised, labeled, and sold the PRODUCT to Plaintiff McCrabb and other Class Members in Missouri as having qualities and benefits it does not have. This constitutes deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact about the sale or advertisement of any merchandise in trade or commerce.

120. Defendant is aware that consumers like Plaintiff McCrabb and Class Members are consumers who are concerned about the effectiveness and utility of tools like the PRODUCT. Defendant intended that Plaintiff McCrabb and Class Members would rely on its labeling and advertising about the quality and usability of the PRODUCT.

121. Defendant's misrepresentations about the qualities of the PRODUCT are material because they concern the type of information upon which a reasonable consumer would be expected to rely in deciding whether to purchase the PRODUCT.

122. Defendant committed the unfair and deceptive acts in the conduct of its trade and commerce because Defendant is in the business of selling the PRODUCT.

123. By claiming the PRODUCT has qualities and abilities it does not have, Defendant creates a false impression that has the tendency and capacity to mislead consumers (see 15 C.S.R. 60-9.020). Moreover, the overall marketing of the PRODUCT has the tendency and capacity to mislead consumers (see 15 C.S.R. 60-

9.030) because it creates the false impression that the PRODUCT has qualities it does not have.

124. Defendant's conduct has caused and continues to cause substantial economic injury to consumers.

125. In purchasing the PRODUCT, Plaintiff McCrabb acted as a reasonable consumer in light of all the circumstances in purchasing the PRODUCT based on the Representations, which would have caused and did cause reasonable persons like Plaintiff McCrabb and Class Members to purchase the PRODUCT.

126. Because the PRODUCT is not as it is represented to be on the labels and in Defendant's marketing materials, the PRODUCT as sold was worth less than as represented, and Plaintiff McCrabb and Class Members paid a premium for them. Had the truth been known, Plaintiff McCrabb and Class Members would not have purchased the PRODUCT at all or would have paid less for it.

127. Plaintiff McCrabb and Class Members were deceived by Defendant's marketing and product labeling about the qualities and capabilities of the PRODUCT. Plaintiff McCrabb and Class Members suffered economic damages as a proximate result of Defendant's unlawful conduct as alleged, including the difference between the actual value of the PRODUCT and the value of the PRODUCT if it had been as represented.

128. Plaintiffs can and will show sufficient, definitive, and objective evidence of damages with a reasonable degree of certainty, which includes the full purchase price of the PRODUCT or its diminished value, which will be proven by Defendant's own documents and expert analysis as this case progresses.

## **EIGHTH CAUSE OF ACTION: Violation of Illinois Consumer Fraud and Deceptive Business Practices Act**

*(On Behalf of Plaintiff Caraballo and the Illinois Class)*

129. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

130. Defendant engaged in a deceptive practice by selling and marketing a defective PRODUCT with the false Representations. The PRODUCT was therefore worth less than as represented.

131. Defendant's misrepresentations are material because they conveyed false information that Plaintiff Caraballo and Class Members relied on when considering whether to purchase the PRODUCT.

132. Defendant engaged in these deceptive practices in the course of its trade or commerce because Defendant is in the business of distributing and selling the PRODUCT, and it does so throughout Illinois.

133. Defendant's deceptive practices proximately caused Plaintiff Caraballo's and Class Members' damages, in that they received a less capable product than advertised. Plaintiff Caraballo and Class Members therefore did not receive the benefit of their bargain.

134. Plaintiff Caraballo's and Class Members' damages include the full purchase price of the PRODUCT, or the difference between what they paid for the PRODUCT and what the PRODUCT was actually worth. Because it was not as represented, the PRODUCT as sold was worth less than the product as represented, and Plaintiff Caraballo and Class Members paid an excess amount for it. Had Plaintiff Caraballo and Class Members known the truth, they would have paid less for the PRODUCT or would not have purchased it at all.

**NINTH CAUSE OF ACTION: Violation of Illinois Consumer Fraud and Deceptive Business Practices Act (Unfair Practices)**

*(On Behalf of Plaintiff Caraballo and the Illinois Class)*

135. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

136. Defendant engaged in unfair acts or practices by continuing to sell the PRODUCT despite knowing that the PRODUCT was defective and dangerous.

137. Defendant engaged in these unfair acts or practices in the course of its trade or commerce because Defendant is in the business of distributing and selling the Product, and it does so throughout Illinois.

138. Defendant's unfair acts or practices offend public policy and are immoral, unethical, oppressive, or unscrupulous, because put Plaintiffs and class members at risk of injury. Moreover, Plaintiff Caraballo and Class Members are not receiving truthful information about the PRODUCT's capabilities and safety.

139. Defendant's unfair practices proximately caused Plaintiff Caraballo's and Class Members' damages, in that they received a PRODUCT that is worthless or worth less than they paid for it.

140. Plaintiff Caraballo's and Class Members' damages are substantial, are not outweighed by any countervailing benefits, and are damages Plaintiff Caraballo and Class Members could not reasonably have avoided.

**TENTH CAUSE OF ACTION: Violation of Florida's Deceptive and Unfair**

**Trade Practices Act, Fla. Stat. §§ 501.201**

*(On Behalf of Plaintiff Malone and the Florida Class)*

141. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

142. This cause of action is brought pursuant to sections 501.201 to 501.213, Florida Statutes, which is known as the Florida Deceptive and Unfair Trade Practices Act (FDUTPA).

143. FDUTPA "shall be construed liberally to promote the following policies: (1) To simplify, clarify, and modernize the law governing consumer protection, unfair methods of competition, and unconscionable, deceptive, and unfair trade practices; (2) To protect the consuming public and legitimate business enterprises from those who engage in unfair methods of competition, or unconscionable, deceptive, or unfair acts or practices in the conduct of any trade or commerce; [and] (3) To make state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection." Fla. Stat. § 501.202(2).

144. The FDUTPA declares the following to be unlawful: "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Florida Statutes § 501.204.

145. Accordingly, pursuant to section 501.204(1), Florida Statutes, Plaintiff Malone seeks an order declaring that Defendant's representations regarding the PRODUCT are unlawful. Fla. Stat. § 501.204(1).

146. Section 501.204(2), Florida Statutes states that "it is the intent of the Legislature that, in construing subsection (1), due consideration and great weight shall be given to the interpretations of the Federal Trade Commission and the

federal courts relating to s. 5(a)(1) of the Federal Trade Commission Act, 15 U.S.C. s. 45(a)(1) as of July 1, 2015."

147. Pursuant to section 501.211(1), Florida Statutes, Plaintiff Malone seeks declaratory relief in the form of an order declaring Defendant's representations regarding the PRODUCT to be a deceptive and unfair business practice, and to enjoin Defendant from continuing its deceptive and unfair business practice, including being ordered to immediately cease its use of the PRODUCT's representations in any regard on any the labeling and/or packaging, and to cease claiming, stating, representing, advertising, marketing or sell the PRODUCT with the representations ("Without regard to any other remedy or relief to which a person is entitled, anyone aggrieved by a violation of this part may bring an action to obtain a declaratory judgment that an act or practice violates this part and to enjoin a person who has violated, is violating, or is otherwise likely to violate this part"). Fla. Stat. § 501.211(1).

148. Pursuant to section 501.211(2), Florida Statutes, Plaintiff Malone, individually and on behalf of members of the putative Class, seeks an order awarding actual damages, plus attorneys' fees, and costs, suffered from their loss of the total amounts they paid to purchase the PRODUCT that make the unlawful representations. Fla. Stat. §§ 501.211(2), 2105(1).

149. Because Plaintiff Malone would not have purchased the PRODUCT but for its representations, actual damages should be calculated based on the PRODUCT's entire purchase price. Actual damages should be easily calculated through discovery requesting Defendant's total sales of the PRODUCT throughout the State of Florida and/or nationwide during the Class Period. Alternatively, Plaintiff Malone seeks "premium purchase price damages" suffered by Plaintiff Malone and members of the putative Class, to be calculated by a comprehensive

review of the consumer marketplace to determine the aggregate price premium paid by Plaintiff Malone and members of the putative Class throughout the State of Florida and/or nationwide during the Class Period, or alternatively calculated based on an analysis of market value factoring consumers' willingness to pay for, and a certain amount for, the PRODUCT. It should be undisputed that a product using the PRODUCT's representations commands a higher price or demand than other similar products that make the same claims, otherwise Defendant would not have made the marketing decision to put them on the labels.

150. Defendant intended that Plaintiff Malone and reasonable consumers would rely on the unfair acts or practices because Defendant did not disclose the PRODUCT's faults. Defendant's unfair acts or practices are immoral, unethical, oppressive, or unscrupulous because selling a defective product without adequately disclosing that fact does not comport with reasonable consumers' expectations to be told the truth about what they are buying and using. The PRODUCT was therefore worth less than as represented, consumers paid a price premium which they would not have paid absent Defendant's misrepresentations, and consumers did not receive the benefit of their bargain.

151. Defendant intended for Plaintiff Malone and reasonable consumers would rely on the deceptive practice because Defendant is aware that consumers like Plaintiff Malone and Class Members desire purchasing tools that work as advertised. Defendant intended to, and did, prey on these interests.

152. Defendant's misrepresentation is material because it conveys false information that reasonable consumers would rely upon when considering whether to purchase the product.

153. Defendant's deceptive or unfair practice occurred in the course of Defendant's trade or commerce because Defendant is in the business of

manufacturing, distributing, and selling the PRODUCT, and it does so throughout Florida.

154. Defendant's deceptive or unfair practices caused Plaintiffs and consumers actual damages because they purchased a product worth less than advertised.

155. These damages include the purchase price of the PRODUCT or the difference between what Plaintiff Malone paid for the product and what the product was actually worth, or the price premium associated with the deceptive practice. Because the product was not as represented, the product as sold was worth less than the product as represented, and Plaintiff Malone and Class Members paid an excess amount for it. Had the truth be known, consumers would not have purchased the product at all or would have paid less for them.

156. Defendant should also be ordered to cease and its deceptive and unfair business practices and should be made to engage in a corrective advertising campaign, to inform consumers that its representations regarding the PRODUCT were false when purchased.

## <u>ELEVENTH CAUSE OF ACTION: Violation of the Texas Deceptive Trade Practices Act</u>

*(On Behalf of Plaintiff Neal and the Texas Class)*

157. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

158. Under the Texas DTPA, Plaintiff Neal and other Class Members are consumers because they paid Defendant for the PRODUCT. See Tex. Bus. & Com. Code § 17.45.

159. Defendant used or employed false, misleading, or deceptive acts or

practices enumerated in § 17.46(b) of the DTPA by committing one or more of the following acts, among others:

a. Representing that the PRODUCT had sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities which it did not have (§ 17.46(b)(5));

b. Representing that the PRODUCT was of a particular standard, quality, or grade, or that the PRODUCT was of a particular style or model, when it was of another (§ 17.46(b)(7));

c. Knowingly making false or misleading statements of fact concerning the need for parts, replacement, or repair service (§ 17.46(b)(13));

d. Failing to disclose information concerning the PRODUCT which was known at the time of the transaction, and such failure to disclose was intended to induce Plaintiff Malone and other Class Members into a transaction which they would not have entered had the information been disclosed (§ 17.46(b)(24)).

160. Further, Defendant breached its implied warranties to Plaintiff Malone and other Class Members that, among other things, the PRODUCT was fit for its advertised purposed. This breach is actionable pursuant to § 17.50(a)(2) of the Texas DTPA.

161. Defendant also committed unconscionable acts or engaged in an unconscionable course of action by its acts or practices as more fully described above in violation of §17.50(a)(3) of the Texas DTPA.

162. Defendant's foregoing acts and practices were the producing cause of Plaintiff Malone's and other Class Members' actual and consequential damages in

an amount within the jurisdictional limits of this Court, for which Plaintiff Malone and other Class Members ask judgment against Defendant.

163. Further, Defendant knowingly and intentionally engaged in the conduct described above. Accordingly, pursuant to § 17.50(b)(1) of the Texas DTPA, Plaintiff Malone and other Class Members seek three times the amount of their economic damages.

**TWELFTH CAUSE OF ACTION: Violation of California's Consumers Legal Remedies Act, California Civil Code § 1750, et seq.**

*(On Behalf of Plaintiff Buenrostro and the California Class)*

164. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

165. Plaintiff Buenrostro is a "consumer" within the meaning of California Civil Code § 1761 (d) because he purchased a good, the Subject PRODUCT, for "personal, family, or household purposes."

166. Defendant is a "person" as defined by California Civil Code § 1761 (c).

167. Defendant's Representations and failure to disclose the defect in the PRODUCT violated California Civil Code § 1770 (a)(5), as they led consumers to believe that the PRODUCT had characteristics and benefits which it does not have. See Cal. Civ. Code § 1770 (a)(5).

168. Defendant's Representations and failure to disclose the defect in the PRODUCT violated California Civil Code § 1770 (a)(7), as it led consumers to believe that the PRODUCT was of a particular standard, grade, or quality when it

was of another. See Cal. Civ. Code § 1770 (a)(7).

169. Defendant's unfair and deceptive acts or practices that occurred repeatedly in Defendant's trade or business were capable of deceiving a substantial portion of the purchasing public and imposed a serious safety risk on the public.

170. Defendant knew that the PRODUCT suffered from an inherent defect, was defectively designed, and was not suitable for its intended use because, for over a decade, Harbor Freight received reviews from multiple other consumers on its website reporting that their PRODUCTs broke in the same way that Plaintiffs' did. Some reviews even attached photographs showing the same specific defect Plaintiffs' PRODUCT exhibited.

171. As a result of his reliance on Defendant's Representations and omissions, Plaintiffs suffered actual damages in that the PRODUCT cannot be used for its foreseeable purpose. Plaintiffs suffered an ascertainable loss of money, property, and value of his PRODUCT.

172. Defendant was under a duty to Plaintiffs to disclose the defective nature of the PRODUCT and/or the associated repair costs because:

a. Defendant was in a superior position to know the true state of facts about the defect in the PRODUCT; and

b. Plaintiffs could not have been expected to discover that his PRODUCT was defective until the defect manifested; and

c. Defendant knew that Plaintiffs could not reasonably have been expected to learn of or discover the defect.

173. By the Representations and failing to disclose the defective nature of the PRODUCT after being put on notice by numerous customer reviews, Defendant knowingly and intentionally concealed material facts about the PRODUCT and

breached its duty not to do so.

174. The Representations and facts Defendant concealed from or failed to disclose to Plaintiffs and Class Members are material in that a reasonable consumer would have considered them to be important in deciding whether to purchase the PRODUCT. Had Plaintiffs known the PRODUCT could not perform as it should have and was susceptible to breaking, he would not have purchased the PRODUCT.

175. As a direct and proximate result of Defendant's unfair or deceptive acts or practices, Plaintiffs suffered and will continue to suffer actual damages.

176. Under California Civil Code § 1780, Plaintiffs are entitled to actual damages, equitable relief, restitution, punitive damages, and any other relief the court deems proper.

177. On October 28, 2025, Plaintiffs provided Defendant with written notice of its violations of the CLRA. Defendant failed to provide appropriate relief for their violations of the CLRA within 30 days. Therefore, Plaintiffs seeks monetary, compensatory, and punitive damages, in addition to injunctive and equitable relief.

**THIRTEENTH CAUSE OF ACTION: Breach of Implied Warranty Pursuant to Song-Beverly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, et seq.**

*(On Behalf of Plaintiff Buenrostro and the California Class)*

178. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

179. Plaintiffs are a "buyer" under California Civil Code § 1791 because he bought the PRODUCT from Defendant, who was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of PRODUCT.

180. At all relevant times that Defendant manufactured, distributed, warranted, and sold the PRODUCT, it had actual or constructive knowledge of the purpose for which the PRODUCT would be utilized by consumers, including Plaintiffs.

181. Defendant provided Plaintiffs and Class Members with an implied warranty that the PRODUCT was merchantable and fit for the ordinary purpose for which it was sold. However, the PRODUCT was not fit for its ordinary purpose of loosening difficult-to-remove nuts and bolts because the PRODUCT suffered from an inherent defect at the time of sale and thereafter, was not fit for ordinary use.

182. Defendant impliedly warranted that the PRODUCT was of merchantable quality and suited for ordinary use.

183. Despite this warranty, the PRODUCT was not fit for ordinary use at the time of sale and thereafter. When used in a foreseeable manner to loosen hard-to-remove lug nuts, the PRODUCT can and does break.

184. As a result of the PRODUCT's inherent defect, Plaintiffs suffered actual damages in that the PRODUCT could not be utilized for its intended, foreseeable purpose. Plaintiffs suffered an ascertainable loss of money as a result of Defendant's breach of the implied warranty of merchantability, as well as an ascertainable loss of property.

185. Defendant's actions, as complained of herein, violate California Civil Code §§ 1792 and 1791.1 by breaching the implied warranty that the PRODUCT was of merchantable quality and fit for such use.

## **FOURTEENTH CAUSE OF ACTION: Breach of California Unfair**

**Competition Law, Pursuant to California Business and Professions Code § 17200, et seq.**

*(On Behalf Plaintiff Buenrostro and the California Class)*

186. Plaintiffs incorporate by reference the allegations contained in the preceding paragraphs of this Complaint.

187. Defendant is a "person" under California Business and Professions Code § 17201.

188. The California Unfair Competition Law, codified in the Business and Professions Code § 17200, prohibits any "unfair competition," including "unlawful, unfair, or fraudulent business acts or practices" and "unfair, deceptive, untrue, or misleading advertising."

189. Defendant's Representations and failure to disclose the Product defects were unlawful, fraudulent, and unfair because Defendant knew, or constructively knew, that the PRODUCT suffered from an inherent defect, would fail prematurely, and was not fit for their intended use.

190. Defendant was under a duty to Plaintiffs and Class Members to disclose the defective nature of the PRODUCT because:

a. Defendant was in a superior position to know the true state of facts about the defect in the PRODUCT; and

b. Plaintiffs could not have been expected to discover that their PRODUCTs were defective until the defect manifested; and

c. Defendant knew that Plaintiffs could not reasonably have been expected to learn of or discover the defect.

191. Defendant has breached its duty to disclose the defects with the

PRODUCT by knowingly and intentionally concealing material facts about the defect.

192. The defective nature of the PRODUCT was a material fact in that a reasonable person would have considered it to be important when choosing whether to purchase the Defendant's PRODUCT. Had Plaintiffs known that the PRODUCT was defective and not as represented, Plaintiffs would not have purchased the PRODUCT from Defendant.

193. Defendant's acts, conduct, and practices were also unlawful in that they constituted:

a. Violation of the common law as set forth herein;

b. Violations of the California Consumers Legal Remedies Act and other state consumer protection statutes alleged herein; and

c. Violations of the Song-Beverly Consumer Warranty Act.

194. Defendant's deceptive acts and omissions occur repeatedly in the Defendant's business as consumers continue to buy the PRODUCT and Defendant's acts and omissions are capable of deceiving and in fact do deceive a substantial portion of the purchasing public.

195. As a result of Defendant's unlawful and fraudulent business practices, Plaintiffs and Class Members have suffered actual damages.

196. Defendant has thus been unjustly enriched, and under §§ 17203 and 17204 of the Business and Professions Code, should be required to make restitution to the Plaintiffs and Class Members.

## DEMAND FOR TRIAL BY JURY

197. Plaintiffs, Jose Buenrostro, Randal Allen, Sr., Miller McCrabb, Eduardo Caraballo, Tony Malone, and Joemar Neal, hereby demand trial of all

causes of action by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all similarly situated persons, prays the Court:

a. grant certification of this case as a class action;

d. appoint Plaintiffs as Class Representatives and Plaintiffs' counsel as Class Counsel;

e. award compensatory damages to Plaintiffs and the proposed Class;

f. award statutory damages to Plaintiffs and the proposed Class;

g. require Defendant to disgorge or pay restitution of its ill-gotten gains;

h. award punitive damages to Plaintiffs and the proposed Class;

i. award pre-judgment and post-judgment interest;

j. award reasonable and necessary attorneys' fees and costs;

k. Issue an order of declaratory relief; and

l. Such other and further relieve, in law or in equity, as the Court deems just and proper.

Dated: March 23, 2026.

Respectfully submitted,

FIELDS LAW FIRM

BY:____________________

Benjamin C. Fields (SBN 331033)
Attorney for Plaintiffs

FIELDS LAW FIRM
354 Pine Street, Third Floor
San Francisco, California 94104
Ph: (415) 376-2877 F: (816) 659-9969
Email: ben@fieldslawkc.com

Eugene A. "Chip" Brooker, Jr.
(admitted *pro hac vice*)
BROOKER LAW, PLLC
4311 Oak Lawn Ave., Suite 620
Dallas, Texas 75219
Ph: (214) 217-0277
Email: chip@brookerlaw.com
chase@brookerlaw.com

Stuart L. Cochran
(admitted *pro hac vice*)
Texas State Bar No. 24027936
Nick H. Burns (admitted *pro hac vice*)
Texas State Bar No. 24128189
CONDON TOBIN SLADEK SPARKS
NERENBERG PLLC
8080 Park Lane, Suite 700
Dallas, Texas 75231
Ph: (214) 265-3800
scochran@condontobin.com
nburns@condontobin.com